UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT
_____
JOHNSON CONTROLS INC.,

|  |  |
|---|---|
| Plaintiff, | **COMPLAINT** |
| - against - | Case No. _____ |
| HEATHER CLARK, MICHELLE ST. HILAIRE and ENCORE HOLDINGS, LLC d/b/a ENCORE FIRE PROTECTION, | |
| _____ Defendants. | |

Plaintiff Johnson Controls Inc. ("JCI") brings this Complaint against Defendants Heather Clark ("Clark"), Michelle St. Hilaire ("St. Hilaire"), and Encore Holdings, LLC d/b/a Encore Fire Protection ("Encore") (collectively, "Defendants") alleging as follows:

## NATURE OF ACTION

1. This action seeks to redress Defendants' coordinated scheme to (a) misappropriate JCI's trade secrets and confidential and proprietary business information, (b) breach employee non-solicitation, confidentiality, and return-of-property covenants, (c) tortiously interfere with JCI's contractual relationships with its employees and customers in the Vermont and Albany, New York markets, and (d) engage in a civil conspiracy.

2. In connection with her employment with JCI, Clark entered into an employment agreement (the "Clark Agreement"), which is attached hereto as **Exhibit 1**. Among the obligations contained in the Clark Agreement, Clark agreed that for one year after the end of her employment with JCI she would not (i) solicit or recruit JCI employees who had material contact with Clark, were directly managed by Clark, or who reported to Clark in the twelve months preceding the end of her employment, (ii) assist any other company (such as Encore) in identifying any JCI employee who had material contact with Clark, were directly managed by Clark, or who reported to Clark in

the twelve months preceding the end of her employment, (iii) solicit or induce any of JCI's customers with whom Clark had material contact during the two years preceding her termination to purchase goods or services that are sold by JCI from a different company, (iv) assist another company in identifying or soliciting any of JCI's customers, and (v) otherwise interfere with JCI's relationships with its employees, customers, agents, or other representatives.

3.     Despite these post-employment confidentiality obligations, Clark—while still employed by JCI as a Fire Service Manager—covertly downloaded **3,754** JCI documents onto a personal USB device during the final forty-eight hours of her employment. These documents contain JCI's trade secrets and confidential and proprietary information relating to existing and potential clients, customer contracts, proposals, quotes, bids and renewal letters, technician licenses, technician certifications, technician performance reviews, and private personnel records, among other highly sensitive and non-public information belonging to JCI (the "Confidential Information").

4.     Despite her employee non-solicit obligations, beginning prior to her last day at JCI, Clark has solicited her subordinates at JCI to join her at Encore.

5.     Clark has now commenced employment with Encore, a direct competitor with JCI, and has continued to exploit the materials she misappropriated to solicit JCI's employees for Encore's benefit.

6.     As with Clark, St. Hilaire entered into an employment agreement with JCI (the "St. Hilaire Agreement"), which is attached hereto as **Exhibit 2**. The St. Hilaire Agreement contains various obligations, including St. Hilaire's promise that for two years after the end of her employment with JCI she would not (i) solicit or recruit JCI employees to leave their employment with JCI to accept employment or render services to any other company, (ii) assist any other

company in identifying or hiring any JCI employee, (iii) solicit or induce any of JCI's customers to purchase goods or services that are sold by JCI from a different company, (iv) assist another company in identifying or soliciting any of JCI's customers, and (v) otherwise interfere with JCI's relationships with its employees, customers, agents or other representatives.

7.     St. Hilaire, who is Clark's former supervisor at JCI and now an Encore manager, helped orchestrate and facilitate Clark's and Encore's scheme.

8.     Together, Clark and St. Hilaire have already lured away at least three licensed sprinkler-fitter technicians and one service coordinator, depriving JCI of critical resources and leaving JCI unable to perform contracted services in the Vermont region.

9.     Encore is a direct competitor of JCI in the industry of fire sprinkler inspections, testing, and maintenance services. Among other markets, Encore and JCI directly compete with one another in the Vermont and Albany, New York region.

10.     Rather than compete fairly in this market, Encore has encouraged, tolerated, and/or acquiesced to Clark and St. Hilaire's actions, allowing it to bootstrap JCI's development of Confidential Information, technicians, sales representatives, and client goodwill for Encore's benefit and to JCI's detriment.

11.     Encore knew or should have known of Clark's and St. Hilaire's contractual breaches, and has accepted the fruits of Clark's theft of trade secrets and confidential and proprietary information, threatening further harm to JCI's workforce and customer base.

12.     If Defendants are allowed to continue their scheme unabated, JCI will suffer irreparable harm, including the loss of critical customer goodwill it has expended significant resources to develop.

13.    JCI therefore asserts claims for injunctive relief under the Defend Trade Secrets Act ("DTSA"), the Stored Communications Act ("SCA"), the Computer Fraud & Abuse Act ("CFAA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Vermont Consumer Protection Act ("VCPA"), as well as claims for breach of contract, misappropriation of confidential information and trade secrets, tortious interference with contract, breach of fiduciary duty and duty of loyalty, conspiracy, and unfair competition under Vermont Law. JCI is also entitled to recovery of its attorneys' fees and costs under the Confidentiality Agreement that Clark and St. Hilaire entered with JCI.

14.    JCI seeks temporary, preliminary, and permanent injunctive relief, as well as its attorneys' fees and costs, and all other appropriate relief.

## THE PARTIES

15.    Plaintiff Johnson Controls, Inc. is a Wisconsin corporation with its principal place of business at 5757 N. Green Bay Avenue, Milwaukee, Wisconsin.

16.    Defendant Heather Clark is an individual domiciled in Vermont. Until May 6, 2025, Clark was employed by JCI as a Fire Service Manager working in JCI's Williston, Vermont office. Clark's territory covered the Vermont and Albany, New York markets.

17.    Defendant Michelle St. Hilaire is an individual domiciled in Vermont. Until August 23, 2024, she was employed by JCI as Fire Service Manager, working in JCI's Williston, Vermont office, covering the same territory.

18.    Defendant Encore Holdings, LLC is a Rhode Island limited liability company with its principal place of business at 70 Bacon Street, Pawtucket, Rhode Island. Encore transacts business in Vermont and competes directly with JCI for fire-protection and sprinkler services in those markets, among other markets in the Northeast United States.

4

## JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because JCI asserts federal claims under the DTSA, the SCA, the CFAA, and RICO.

20.     The Court also has diversity jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states: Plaintiff Johnson Controls, Inc. is a citizen of Wisconsin; Defendant Heather Clark is a citizen of Vermont; Defendant Michelle St. Hilaire is a citizen of Vermont; and Defendant Encore Holdings, LLC is a citizen of Rhode Island.

21.     The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Defendants Clark and St. Hilaire because they reside and transacted their misconduct in Vermont. The Court has personal jurisdiction over Encore because, *inter alia*, it purposely directed its tortious conduct in Vermont and transacts substantial business within Vermont.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here, and because Defendants are subject to personal jurisdiction in this District.

## FACTS

### A.      JCI's Business and Confidential Information

24.     JCI is an international leader in building-safety solutions, including installation, inspection, and servicing of fire-alarm and fire-sprinkler systems. JCI's Vermont/Albany market, which Clark and St. Hilaire each helped manage for JCI, houses critical customer relationships worth millions of dollars in annual revenue.

25.     JCI has developed its Confidential Information (as further defined by the Confidentiality Agreement described below) at significant time and expense, including its proprietary customer data, pricing models, renewal strategies, bids, contract templates, technician certification matrices, and other information that provide a competitive advantage.

26.     JCI protects this information through robust cybersecurity controls, tiered access rights, written policies, and mandatory employee agreements containing confidentiality, non-solicitation, and return-of-property obligations.

27.     In consideration of employment with JCI, all senior employees must enter into an Employee Confidentiality Agreement (the "Confidentiality Agreement"), which is attached hereto as **Exhibit 3**.

28.     The Confidentiality Agreement protects JCI's intellectual property and Confidential Information, and employees recognize the value and need to protect such property and information through the following provision:

> 2. Background. Employer has developed and continues to develop specialized techniques, processes, practices and products which provide it with a competitive advantage. Employer has expended significant time, money and resources in its business activities, including in research and development activities. Employer has developed, owns or has otherwise obtained exclusive rights relating to various aspects of its business, including the design, manufacture, application, sale, and testing of products and related technology.

(Ex. 3, ¶ 2.)

29.     The Confidentiality Agreement also sets forth specific directives regarding the use of Confidential Information, to be used solely for JCI's benefit:

> 5. Confidential Information. Employee agrees during the course of Employee's employment, Employer may disclose, or promise to provide Employee with confidential, proprietary and competitively sensitive information from time to time concerning, among other things, Employer's strategies, objectives, performance and business prospects ("Confidential Information" as described below).

6

> Employee agrees that during his or her employment with Employer, and until such time thereafter as the Confidential Information is no longer confidential through no fault of the Employee, Employee shall not use or disclose any Confidential Information except for the benefit of Employer in the course of the Employee's employment, and shall not use or disclose any Confidential Information in competition with or to the detriment of Employer, or for the benefit of Employee or anyone else other than Employer.

(*Id.*, ¶ 5.)

30.    The definition of "Confidential Information" is also clearly set forth in the Confidentiality Agreement:

> "Confidential Information" means any information that is not generally known outside the Employer, relating to any phase of business of Employer, whether existing or foreseeable, including information conceived, discovered or developed by Employee. Confidential Information includes, but is not limited to … business plans, financial statements and projections; operating forms (including contracts) and procedures; payroll and personnel records; non-public marketing materials, plans and proposals; customer lists and information, and target lists for new clients and information relating to potential clients[;] raw materials sources, price and cost information; administrative techniques and documents; and any information received by the Company under an obligation of confidentiality to a third party.
>
> Employee recognizes and acknowledges that Employer's success depends upon, among other things, current and former employees keeping such Confidential Information confidential.

(*Id.*)

31.    The Confidentiality Agreement also sets forth an employee's obligations with respect to returning Confidential Information at the end of the employee's employment with JCI:

> 6. <u>Return of Confidential Information.</u> Upon termination of Employee's employment with Employer, whether voluntary or otherwise, or at any time upon Employer's request, Employee shall promptly deliver and return to Company all of Employer's property and Confidential Information including, but not limited to, computers, tablets, cellular telephones, drawings, blueprints, manuals, samples, customer lists, financial data, letters, notes, notebooks, reports and all copies thereof, and any and all other materials of a secret or confidential nature relating to Employer's

7

business which are in the possession or under the control of Employee.

(*Id.*, ¶ 6.)

32.    Further, the Confidentiality Agreement contemplates the remedies available to JCI if an employee commits any breach:

> 7. <u>Remedies.</u> Employee acknowledges that the restrictions contained in this Agreement are necessary to protect Employer's legitimate interests and that any violation of this Agreement would result in irreparable harm and injury to Employer. Employee further acknowledges that a remedy at law for any breach or threatened breach of the provisions of this Agreement would be inadequate and, therefore, agrees Employer shall be entitled to injunctive relief and any other legal or equitable remedies available Employer in the case of any such breach or threatened breach. In the event that a court determines Employee has breached or threatened to breach this agreement, Employee agrees to reimburse Employer for all of its attorneys' fees and costs incurred in enforcing the terms of this Agreement.

(*Id.*, ¶ 7.)

33.    The Confidentiality Agreement makes clear that JCI may pursue any other remedies against the employee and the employee's new employer:

> However, nothing in this Agreement shall be construed as prohibiting Employer from pursuing any other remedies available for such breach or threatened breach against Employee or Employee's new employer, which may also include, but not be limited to, contract damages, lost profits and punitive damages.

(*Id.*)

34.    On July 12, 2018, St. Hilaire entered into the Confidentiality Agreement. (Ex. 3.)

35.    On March 31, 2023, Clark entered into the Confidentiality Agreement. (Ex. 3.)

**B.    Clark's Employment With JCI and Access to JCI Confidential Information**

36.    Clark first joined JCI in 2008, returned in 2019 as a Sales Representative, was promoted to Fire Service Supervisor in April 2023, and elevated to Fire Service Manager in December 2024.

8

37.     When Clark was offered the position of Fire Service Supervisor in April 2023, she reported to St. Hilaire. At that time, St. Hilaire served as the Fire Service Manager. Clark and St. Hilaire oversaw JCI's Vermont and Albany, New York territory.

38.     As Fire Service Supervisor, Clark was responsible for supervising technicians, developing business strategies, and driving JCI's overall profitability and growth. In that capacity, Clark had access to Confidential Information including but not limited to business plans; contracts; payroll and personnel records; plans and proposals; customer lists; pricing and cost information; and information related to potential clients.

39.     Following St. Hilaire's departure from JCI in August 2024, Clark was promoted into St. Hilaire's position as Fire Service Manager on December 2, 2024.

40.     As Fire Service Manager, Clark was tasked with driving customer satisfaction, enhancing customer relationships, ensuring that JCI met its contractual obligations, and supervising a team of technicians. In their capacities as Fire Service Manager, both Clark and St. Hilaire had access to business plans; contracts; payroll and personnel records; plans and proposals; customer lists; pricing and cost information; information related to potential clients; and technician personnel records.

41.     In her roles as both Fire Service Supervisor and Fire Service Manager, Clark's responsibilities included *inter alia* (1) overseeing and supporting members of the sales team, (2) working closely with JCI's technicians, including sprinkler fitters, and (3) developing and maintaining business relationships with both existing and new potential clients in the Vermont and Albany market.

42.     These positions afforded Clark exceptional access to JCI's most important business relationships, potential new business relationships, and JCI's sales representatives and technicians.

43.     As both Fire Service Supervisor and Fire Service Manager, Clark directly engaged with JCI's customers, managed new and existing business relationships, and oversaw multiple other employees.

44.     During her tenure with JCI, Clark was entrusted with JCI's Confidential Information and the critical responsibility of cultivating, nurturing, and maintaining existing and new client relationships.

45.     The success of JCI's business hinges on those existing and new client relationships, as they directly affect JCI's profitability.

46.     The success of JCI's business also hinges on maintaining the Confidential Information that Clark was privy to.

47.     Clark frequently interacted with clients on behalf of JCI.

48.     Throughout her employment with JCI, Clark had access to and used Confidential Information that JCI cultivated and maintained at significant expense over many years, including proprietary and/or confidential information such as customer contracts, proposals, quotes, bids, renewal letters, technician licenses and certifications, technician performance reviews, confidential technician personnel records, and other Confidential Information.

49.     On March 31, 2023, in connection with her employment with JCI, Clark entered into the Clark Agreement. *See* **Exhibit 1**.

50.     The Clark Agreement provides for protection of JCI's Confidential Information both during and after Clark's employment. Relevant provisions of the Clark Agreement include:

> **Non-Solicitation**
> Employee agrees that for the one (1) year period following the Date of Termination, or such longer period of non-solicitation as is included in any offer letter, equity agreement or any other agreement between Employee and the Company or its parent, subsidiaries or affiliates, Employee will not directly or indirectly on behalf of

> Employee or on behalf of another (i) solicit, recruit, aid or induce employees of the Company (a) with whom Employee has had material contact within the course of Employee's employment during the twelve (12) month period preceding Employee's Date of Termination and had access to Confidential Information, trade secrets or customer relationships, or (b) who were directly managed or reported to Employee as of the Employee's Date of Termination to leave their employment with the Company in order to accept employment or render services to or with another person or entity unaffiliated with the Company, or hire or knowingly take any action to assist or aid any other person or entity in identifying or hiring any such employee, or (ii) solicit, aid, or induce any customer of the Company with whom Employee had material contact during the twenty-four (24) month period immediately preceding Employee's Date of Termination to purchase goods or services then sold by the Company from another person or entity, or assist or aid any other persons or entity in identifying or soliciting any such customer, or (iii) otherwise interfere with the relationship of the Company with any of its employees, customers, vendors, agents or representatives.

(Ex. 1 at 1.)

51.     The Clark Agreement also set forth certain remedies to which JCI would be entitled in the event Clark breached this non-solicitation provision, including injunctive relief, equitable relief, and compensatory damages:

> Irreparable injury will result to the Company, its business, and its parent, subsidiaries or affiliates in the event of a breach by you of any of your covenants and commitments that you have accepted as a condition of this employment offer, including the covenants of non-solicitation. Therefore, in the event of a breach of such covenants and commitments, the Company reserves all rights to seek any and all remedies and damages permitted under law, including, but not limited to, injunctive relief, equitable relief and compensatory damages.

(*Id.* at 2-3.)

## C.     St. Hilaire's Employment with JCI and Access to JCI Confidential Information

52.     St. Hilaire joined JCI in 2016 through an acquisition of her then-employer.

53.     In or around July 2018, St. Hilaire was promoted to Fire Service Manager and oversaw the Vermont and Albany market. In that role, St. Hilaire's main responsibilities included

*inter alia* (1) overseeing and supporting members of the sales team, (2) working closely with JCI's technicians, including sprinkler fitters, and (3) developing and maintaining business relationships with both existing and new potential clients in the Vermont and Albany regions.

54.    As with Clark, this position afforded St. Hilaire exceptional access to JCI's most important business relationships, potential new business relationships, and JCI's sales representatives and technicians.

55.    As a Fire Service Manager, St. Hilaire similarly: directly engaged with JCI's customers, managed new and existing business relationships, and oversaw multiple other employees; was entrusted with Confidential Information and the critical responsibility of cultivating, nurturing and maintaining existing and new client relationships; frequently interacted with clients on behalf of JCI; had access to and used Confidential Information that JCI cultivated and maintained at significant expense over many years, including proprietary and/or confidential information such as customer contracts, proposals, quotes, bids, renewal letters, technician licenses and certifications, technician performance reviews, confidential technician personnel records, and other Confidential Information.

56.    On July 12, 2018, in connection with her employment with JCI, St. Hilaire entered into the St. Hilaire Agreement. *See* **Exhibit 2**.

57.    Similar to the Clark Agreement, the St. Hilaire Agreement contained a Non-Solicitation provision which provided:

> Non-Solicitation
> In accepting this employment offer, and in consideration of this employment offer, your continued employment, and/or the Company's obligation and promise to provide you with confidential and propriety information pertaining to its business operations and/or customers, and your promise and obligation not to use or disclose that information except in the course of performing your job duties, you agree that, except as prohibited by law, during your

> employment with the Company or its parent, subsidiaries or
> affiliates, and for the two (2) year period thereafter, you will not,
> directly or indirectly, on your own behalf or on behalf of another (i)
> solicit, recruit, aid or induce any employees of the Company or its
> parent, subsidiaries or affiliates to leave their employment with the
> Company or its parent, subsidiaries or affiliates in order to accept
> employment with or render services to another person or entity
> unaffiliated with the Company or its parent, subsidiaries or
> affiliates, or hire or knowingly take any action to assist or aid any
> other person or entity in identifying or hiring any such employee, or
> (ii) solicit, aid, or induce any customer of the Company or its parent,
> subsidiaries or affiliates to purchase goods or services then sold by
> the Company or its parent, subsidiaries or affiliates from another
> person or entity, or assist or aid any other persons or entity in
> identifying or soliciting any such customer, or (iii) otherwise
> interfere with the relationship of the Company or its parent,
> subsidiaries or affiliates with any of its employees, customers,
> vendors, agents, or representatives.

(Ex. 2 at 1-2.)

58.     JCI's right to relief in the event St. Hilaire breached the St. Hilaire Agreement was

also clearly set forth:

> Irreparable injury will result to the Company, its business, and its
> parent, subsidiaries or affiliates in the event of a breach by you of
> any of your covenants and commitments you have accepted as a
> condition of this employment offer, including the covenants of non-
> solicitation. Therefore, in the event of a breach of such covenants
> and commitments, the Company reserves all rights to seek any and
> all remedies and damages permitted under law, including, but not
> limited to, injunctive relief, equitable relief and compensatory
> damages.

(*Id.* at 2.)

## D.     St. Hilaire Resigns From JCI, Immediately Joins Encore, and Breaches Her Agreement

59.     St. Hilaire resigned from JCI on August 23, 2024. She immediately joined Encore,

and assumed similar managerial responsibility for Encore's Vermont operations as her duties for

JCI.

13

60.     On or about March 7, 2025, JCI's sprinkler-fitter technician Joseph Siskavich ("Siskavich") resigned from JCI's Williston office. Shortly thereafter, he joined Encore in a similar technician role.

61.     Upon information and belief, St. Hilaire directly and/or indirectly solicited Siskavich to leave JCI, in violation of her post-employment non-solicit restrictions.

62.     Upon information and belief, St. Hilaire also directly or indirectly solicited Clark to resign from JCI and join Encore in April 2025.

63.     Upon information and belief, prior to Clark's last day employed at JCI, Clark spoke with St. Hilaire about their mutual plans to solicit JCI employees to work at Encore, including to recruit and hire additional sprinkler fitter technicians from JCI's Williston, Vermont office.

64.     True to their discussions, additional employees have resigned from JCI and joined (or will soon join) Encore, including the remaining sprinkler fitter technicians in JCI's Williston, Vermont office.

65.     Due to the loss of these sprinkler fitter technicians, JCI is restricted from providing services in the Vermont market, jeopardizing multiple customer contracts and maintenance obligations.

**E.     Clark Resigns From JCI, Joins Encore, and Breaches Her JCI Agreement**

66.     In April 2025, Clark approached her subordinate Brian Lencki ("Lencki"), Fire Service Supervisor, before embarking on vacation. At that time, Clark told Lencki that upon her return from vacation she would be resigning from JCI to join Encore. Clark said she was waiting to provide her two weeks' notice to not compromise her vacation plans. Clark directed Lencki not to tell any other employee.

67.     Clark also disclosed to Lencki that she would be pursuing JCI's customer contracts and other employees to join her at Encore, including technicians Ryan Caldwell ("Caldwell") and Mark Garcia ("Garcia").

68.     True to her word, Clark submitted her resignation at the end of April 2025 immediately after returning from her vacation.

69.     When James McFadden ("McFadden"), Regional Service Manager, asked Clark about her post-employment plans, she responded that she would be exploring different career opportunities. Clark never disclosed to McFadden that she would be working for Encore.

70.     Clark planned to join Encore before her vacation, and at the time of her resignation, that she would be working for Encore after leaving JCI.

71.     Upon information and belief, after Clark delivered her resignation to JCI, but prior to her last day of employment, Clark spoke with St. Hilaire about their plans to solicit more JCI employees to work at Encore.

72.     Upon information and belief, after Clark delivered her resignation to JCI, but prior to her last day of employment, Clark spoke with JCI technicians to solicit them to join Encore.

73.     Following Clark's departure from JCI, two of the sprinkler technicians that Clark solicited and recruited—Garcia and Caldwell—resigned from JCI and joined (or plan to join) Encore.

74.     Due to the sudden and unexpected loss of Siskavich, Garcia, and Caldwell to Encore, JCI is restricted from providing sprinkler services in the Vermont region, jeopardizing multiple customer contracts and maintenance obligations.

75.     In addition, Clark solicited JCI's service coordinator in its Williston, Vermont office to leave JCI and join Encore in a similar position.

15

76.    In early June 2025, Clark contacted Systems Integrity Representative Tausha Rockwood ("Rockwood") and asked Rockwood when she would be joining her at Encore.

**F.    Clark's Egregious Theft of JCI Confidential Information and Trade Secrets**

77.    Between May 5 and May 6, 2025—Clark's last two days—Clark copied **3,754** files to a purple Verbatim "Store-n-Go" USB device. The extracted files included, without limitation:

- over one hundred signed customer contracts and renewal letters dated 2019-2025;
- more than sixty active bids, quotes, and pricing worksheets reflecting JCI's proprietary costing algorithms;
- comprehensive customer order-entry forms, inspection reports, and project-management checklists;
- technician licenses, NFPA certifications, performance reviews, timesheets, and private personnel records; and
- internal emails revealing sales strategies and contract-profitability analyses.

78.    Clark had no legitimate business reason to amass these materials, and she never requested or obtained a USB-exception authorization under JCI's device-control policy.

79.    After Clark's separation, JCI's forensic investigators alerted management to the anomalous exfiltration.

80.    JCI promptly demanded that Clark preserve and return all JCI property and cease any solicitation in breach of her covenants.

81.    Through Encore's counsel, Clark falsely responded that she had copied only "personal documents," and that any customer-related materials were left behind for Lencki. Encore's counsel ignored and did not address Clark and St. Hilaire's breach of their employee non-solicit obligations.

82.    Lencki and Rockwood never received a flash drive from Clark.

83.    In fact, Rockwood observed Clark using and removing a purple USB device from her docking station on her final day at JCI.

84.     Putting to rest Encore and Clark's false claim that the Confidential Information was returned, no purple USB device has ever been located in JCI's Williston office.

**G.      Encore Encouraged, Condoned, and Is Benefitting From St. Hilaire and Clark's Acts**

85.     As with JCI, Encore offers a variety of fire protection and sprinkler services. Both JCI and Encore compete in Vermont and Albany, New York, among other markets.

86.     Encore was aware prior to St. Hilaire and Clark's hiring that JCI employees are subject to post-employment covenants.

87.     Encore ignored these obligations and conspired with St. Hilaire to solicit Clark to join Encore. Encore then conspired with both St. Hilaire and Clark to solicit even more JCI employees to join Encore.

88.     Encore took these actions despite being aware that it was conspiring with St. Hilaire and Clark to violate the Clark Agreement, the St. Hilaire Agreement, and the Confidentiality Agreement.

89.     Encore further conspired with Clark to illegally extract JCI's Confidential Information.

90.     Upon information and belief, Encore utilized the technician personnel records that Clark illegally extracted to assess which other employees it would solicit from JCI. Encore hired two sprinkler fitter technicians in June 2025; Clark stole personnel records for both of those sprinkler fitter technicians, which included salary and licensure information.

91.     Through Clark, Encore also possesses Confidential Information regarding JCI customers.

92.     Any additional information regarding Encore's plans to utilize JCI's Confidential Information is solely in the possession of Encore.

**FIRST CAUSE OF ACTION**
**(Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831 *et seq.***
**Against Clark and Encore)**

93.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

94.    Clark's and Encore's actions, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

95.    During her employment with JCI, Clark had access to JCI's Confidential Information.

96.    JCI expended substantial time, effort, money, and resources in acquiring, developing, and maintaining its Confidential Information and trade secrets.

97.    JCI took and takes reasonable efforts to maintain the secrecy of this Confidential Information, for JCI's exclusive benefit and competitive advantage in the industry, including by placing the documents on password-protected servers, monitoring employee access, and requiring all employees to enter into the Confidentiality Agreement as a term of their employment.

98.    Clark wrongfully acquired and retained JCI's Confidential Information, including but not limited to proposals, quotes, pricings, bids, contracts and contract renewals, technicians' performance reviews, technicians' timesheets, and confidential personnel files of technicians.

99.    JCI's Confidential Information constitutes trade secrets.

100.    JCI did not consent to Clark's acquisition, retention, disclosure and use of its trade secrets.

101.    Encore knew or should have known of the Confidentiality Agreement, the Clark Agreement, and Clark's conduct.

18

102.    Showing Encore's knowledge and complicity, Encore's legal counsel falsely claimed Clark had copied only "personal documents" and that any customer-related materials were left behind for Lencki.

103.    Clark did not obtain a USB-exception authorization from JCI to use a USB device in her JCI laptop or docking station.

104.    Encore substantially assisted, benefited from, and was complicit in Clark's unlawful conduct.

105.    At all relevant times, Clark knew that she unlawfully retained JCI's trade secrets, and Encore knew that Clark unlawfully retained and disclosed to them JCI's trade secrets that they have no right to receive and could not receive absent Clark's improper acts. Clark's and Encore's conduct constitutes knowing, willful, and malicious misappropriation.

106.    JCI's trade secrets that Clark and Encore now possess derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

107.    Clark and Encore have already used or plan to in the future use this very information as a road map to unlawfully compete with JCI in the Vermont and Albany market.

108.    Clark and Encore have already used or plan to in the future use JCI's trade secrets to sell, through interstate commerce, services that compete with the services that JCI markets, causing harm to JCI and damage to its relationships with clients.

109.    The public policy in favor of protecting JCI's interest in maintaining its trade secrets firmly outweighs any interest Clark and Encore would have in using JCI's trade secrets, which is none because the information is non-public and proprietary.

110.    As a direct and proximate result of Clark's and Encore's misappropriation of JCI's trade secrets, JCI has suffered and will continue to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients, and will continue to suffer said injury, loss, harm or damage unless and until Clark and Encore are restrained from their continued misappropriation of trade secrets.

111.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

### SECOND CAUSE OF ACTION
**(Violation of the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*
Against Clark)**

112.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

113.    JCI maintains electronic communications and data, including but not limited to internal emails, customer communications, and confidential business records, on protected servers and systems that are used in interstate commerce and are accessible only to authorized users for legitimate business purposes.

114.    During her final days of employment, Clark intentionally and knowingly accessed JCI's protected electronic communications systems, including email accounts and document repositories, without authorization or in excess of any authorization granted to her, for the purpose of obtaining, copying, and exfiltrating confidential and proprietary information belonging to JCI.

115.    Clark's access to these electronic communications was not for any legitimate business purpose and was in direct violation of JCI's policies and her contractual obligations. Clark's conduct included accessing and downloading internal emails, customer communications,

and other electronically stored information that she was not authorized to retain or use after her employment ended.

116.    As a result of Clark's unauthorized access to JCI's electronic communications, JCI has suffered and continues to suffer harm, including the loss and misappropriation of Confidential Information, disruption of business operations, and the need to conduct forensic investigations and implement remedial measures.

117.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

### THIRD CAUSE OF ACTION
**(Violation of the Computer Fraud & Abuse Act, 18 U.S.C. § 1030 *et seq.*
Against Clark)**

103.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

104.    JCI's computer systems and networks are used in interstate commerce, and thus are "protected computers" because JCI conducts business in various parts of the United States.

105.    Clark intentionally and in excess of her authorization accessed JCI's protected computers and networks for the purpose of defrauding JCI and misappropriating its trade secrets.

106.    The access to JCI's protected computers was unauthorized and/or in excess of Clark's authorization. Aware of the impropriety and illegality of her actions, Clark attempted to conceal this misconduct while downloading the trade secrets onto an external flash drive that she took with her from JCI premises.

107.    Clark intentionally accessed JCI's protected computers and knowingly caused the transmission of a program, information, code or command, and as a result of such conduct, she recklessly and intentionally caused damage without authorization. Clark engaged in this conduct without authorization or in excess of any authorization given.

21

108.    Clark's deliberate and intentional actions have caused JCI to suffer significant and irreparable harm.

109.    Further, JCI has and will continue to incur costs and fees, including an investment of time, to determine what Clark may have unlawfully exfiltrated from her protected computer and software, and to obtain its return.

110.    As a direct and proximate result of Clark's actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Clark is retrained from continuing to benefit from the fruits of her violation.

111.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

## FOURTH CAUSE OF ACTION
**(Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* Against All Defendants)**

112.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

113.    Defendants Clark, St. Hilaire, and Encore, acting in association with each other, constituted an enterprise within the meaning of 18 U.S.C. § 1961(4), the purpose of which was to misappropriate JCI's trade secrets and Confidential Information, solicit JCI employees and customers, and unlawfully compete with JCI.

114.    Defendants engaged in a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(1) and (5), including but not limited to violations of the Defend Trade Secrets Act (18 U.S.C. § 1832), the Stored Communications Act (18 U.S.C. § 2701), and the Computer Fraud and Abuse

Act (18 U.S.C. § 1030), by intentionally misappropriating JCI Confidential Information, using interstate wires to further their scheme, and accessing JCI's protected computers without authorization.

115.    Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through this pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

116.    Defendants also conspired to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

117.    As a direct and proximate result of Defendants' actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are retrained from continuing to benefit from the fruits of their violation.

118.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

### FIFTH CAUSE OF ACTION
**(Violation of the Vermont Consumer Protection Act, 9 V.S.A. § 2451 *et seq.*
Against All Defendants)**

119.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

120.    Defendants, in the course of trade or commerce, engaged in unfair or deceptive acts or practices in violation of the Vermont Consumer Protection Act, 9 V.S.A. § 2453, by misappropriating JCI's trade secrets and Confidential Information, soliciting JCI employees in violation of contractual obligations, and using stolen information to unfairly compete with JCI in the marketplace.

121.    Defendants' conduct was willful and intended to confer an improper competitive advantage at JCI's expense, and has caused and continues to cause substantial injury to JCI's business, including loss of trade secrets, employees, customers, and goodwill.

122.    As a direct and proximate result of Defendants' actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are retrained from continuing to benefit from the fruits of their violation.

123.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

## SIXTH CAUSE OF ACTION
### (Breach of Contract – Against Clark)

124.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

125.    Clark entered into valid and enforceable agreements with JCI, namely the Clark Agreement and the Confidentiality Agreement.

126.    Clark breached those agreements by, *inter alia*, failing to return Confidential Information, using that information for her own benefit and for Encore's benefit, soliciting JCI employees (including Garcia, Caldwell, and Rockwood), and interfering with JCI customer relationships within the contractual restricted periods.

127.    As a direct and proximate result of Clark's actions, JCI suffered and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients

and partners, and will continue to suffer said injury, loss, harm or damage unless and until Clark is retrained from continuing to benefit from the fruits of her violation.

128.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

### SEVENTH CAUSE OF ACTION
**(Breach of Contract – Against St. Hilaire)**

129.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

130.    St. Hilaire entered into valid and enforceable agreements with JCI, namely the St. Hilaire Agreement and the Confidentiality Agreement.

131.    St. Hilaire breached those agreements by, upon information belief, directly or indirectly soliciting JCI employees (including Siskavich and Clark), and interfering with JCI's customer relationships within the contractual restricted periods.

132.    As a direct and proximate result of St. Hilaire's actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until St. Hilaire is retrained from continuing to benefit from the fruits of her violation.

133.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

### EIGHTH CAUSE OF ACTION
**(Misappropriation of Trade Secrets – Against Clark and Encore)**

134.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

135.    JCI's Confidential Information constitutes trade secrets under Vermont law because it derives independent economic value from not being generally known and is subject to reasonable measures of secrecy.

136.    Clark and Encore misappropriated JCI's trade secrets by acquiring, disclosing, and using them without JCI's consent and for their own benefit.

137.    As a direct and proximate result of Clark and Encore's actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Clark and Encore are retrained from continuing to benefit from the fruits of their violation.

138.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

## NINTH CAUSE OF ACTION
**(Tortious Interference with Contract – Against All Defendants)**

139.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

140.    JCI has valid, enforceable employment contracts with its sprinkler technicians, service coordinator, and other employees, as well as valid customer contracts in the Vermont and Albany, New York market.

141.    JCI also had valid, enforceable contracts with Clark and St. Hilaire, which were known by Encore and, as to Clark, by St. Hilaire.

142. Defendants knew of those contractual relationships because Clark and St. Hilaire managed or supervised the employees and serviced the customers at issue, and now supervise the same employees and service the same region on behalf of Encore.

143. Encore was independently aware, or should have been aware, of the Clark Agreement, the St. Hilaire Agreement, and the Confidentiality Agreement.

144. Defendants intentionally and without justification induced JCI employees to breach their employment agreements.

145. Defendants' interference was accomplished through wrongful means, including Clark's theft of trade secrets, violations of contractual covenants, and Encore's knowing ratification and encouragement of such misconduct.

146. As a direct and proximate result of Defendants' actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are retrained from continuing to benefit from the fruits of their violation.

147. JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

### TENTH CAUSE OF ACTION
**(Conversion – Against Clark)**

148. JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

149. Clark wrongfully exercised dominion and control over JCI's Confidential Information and property.

150.    As a direct and proximate result of Clark's actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Clark is retrained from continuing to benefit from the fruits of her violation.

151.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

## ELEVENTH CAUSE OF ACTION
### (Breach of Fiduciary Duty and Duty of Loyalty – Against Clark)

152.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

153.    As a Fire Service Manager, Clark owed JCI a duty of loyalty and fiduciary duty during her employment.

154.    Clark breached those duties by, among other things, delaying her separation until after her vacation despite knowing that she would be joining Encore, taking JCI's Confidential Information, and soliciting JCI employees for a competitor all while still employed by JCI.

155.    As a direct and proximate result of Clark's actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Clark is retrained from continuing to benefit from the fruits of her violation.

156.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

## TWELFTH CAUSE OF ACTION
### (Civil Conspiracy – Against All Defendants)

157.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

158.    Defendants agreed and acted in concert to misappropriate JCI's Confidential Information and trade secrets, breach contractual obligations, and interfere with JCI's business relationships. Such conduct constitutes civil conspiracy under Vermont law.

159.    As a direct and proximate result of Defendants' actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are retrained from continuing to benefit from the fruits of their violation.

160.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

## THIRTEENTH CAUSE OF ACTION
### (Unfair Competition – Against All Defendants)

161.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

162.    Defendants' conduct as alleged constitutes unfair competition under Vermont law.

163.    As a direct and proximate result of Defendants' actions, JCI suffers and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill with its clients and partners, and will continue to suffer said injury, loss, harm or damage unless and until Defendants are retrained from continuing to benefit from the fruits of their violation.

164.    JCI is entitled to temporary, preliminary, and permanent injunctive relief, as well as any other relief deemed appropriate by the Court.

### FOURTEENTH CAUSE OF ACTION
### (Attorneys' Fees and Costs – Against Clark and St. Hilaire)

165.    JCI incorporates by reference each of the foregoing allegations as though fully set forth herein.

166.    Section 7 of the Confidentiality Agreement expressly provides that, in the event a court determines that Clark or St. Hilaire "has breached or threatened to breach" the agreement, the employee "agrees to reimburse Employer for all of its attorneys' fees and costs incurred in enforcing the terms of this Agreement."

167.    As detailed in the preceding causes of action, Clark and St. Hilaire have breached and continue to breach the Clark Agreement, the St. Hilaire Agreement, and the Confidentiality Agreement by, among other things, (i) retaining, using, and disclosing JCI's Confidential Information; (ii) failing to return all Confidential Information and company property upon separation; and (iii) soliciting JCI employees.

168.    Through Encore's legal counsel, Clark falsely claimed she had copied only "personal documents" and that any customer-related materials were left behind for Lencki.

169.    As a result of Defendants' actions, JCI has been compelled to retain counsel and incur substantial attorneys' fees and other litigation expenses to investigate, preserve, and prosecute its claims arising from Defendants' misconduct, including the instant action. Such expenditures were made necessary by Clark and St. Hilaire's breaches and were foreseeable to Clark and St. Hilaire at the time they executed the Confidentiality Agreement.

170.    Pursuant to Section 7 of the Confidentiality Agreement and applicable law, JCI is contractually entitled to recover from Clark and St. Hilaire all attorneys' fees and costs that JCI

has incurred, and will continue to incur, in enforcing the Confidentiality Agreement and protecting its trade secrets, confidential information, customer relationships, and goodwill.

171.    JCI is entitled to (i) all reasonable attorneys' fees, expert fees, investigative fees, and litigation costs incurred to date; (ii) all additional attorneys' fees and costs that JCI will incur through the conclusion of this action, including any appeal; and (iii) any other relief deemed appropriate by the Court.

## PRAYER FOR RELIEF

**WHEREFORE**, JCI respectfully requests that the Court:

a.    Enter temporary, preliminary, and permanent injunctive relief prohibiting Defendants from (i) using or disclosing JCI's trade secrets or Confidential Information; (ii) retaining any copies of such information; (iii) soliciting or hiring JCI employees in the Williston, Vermont and Albany, New York market for the duration of Clark and St. Hilaire's contractual restricted periods; and (iv) soliciting or servicing JCI customers in the Williston, Vermont and Albany, New York market with whom Clark or St. Hilaire had material contact within the contractual restricted periods;

b.    Order Defendants to return all of JCI's Confidential Information in their possession or control, in any form, and in a forensically sound manner that complies with Defendants' ongoing duty to preserve relevant documents;

c.    Grant JCI all reasonable attorneys' fees, expert fees, investigative fees, and litigation costs incurred to date, as well as all additional attorneys' fees and costs that JCI will incur through the conclusion of this action, including any appeal; and

d.    Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

JCI demands a trial by jury on all issues so triable.

Date:  New York, New York
       July 10, 2025

Respectfully submitted,

OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
By: /s Aaron Warshaw
    Aaron Warshaw (*admission forthcoming*)
    Danielle Y. Vanderzanden
599 Lexington Avenue, 17th Fl.
New York, New York 10022
(212) 492-2500
aaron.warshaw@ogletreedeakins.com
dani.vanderzanden@ogletreedeakins.com

*Attorneys for Plaintiff*

# EXHIBIT 1



03/31/2023

Heather Clark
13 Mountain View Drive
Rouses Point, NY 12979

Dear Heather,

We are delighted to offer you the position of Supervisor, Service for Johnson Controls Fire Protection LP, a subsidiary or affiliate of Johnson Controls (the "Company"), reporting directly to Michelle St. Hilaire. This position will be located in Clifton Park, New York..

<u>Start Date</u>
Upon acceptance of this new position, your start date has been tentatively scheduled for 04/30/2023.   This transition date is subject to change based upon the needs of your new Manager and departing Manager.

<u>Base Salary:</u>
You will receive an annual base salary of $82,500.00.  Your salary will be paid according to the normal and customary payroll process of the Company.

<u>Bonus Plan</u>
You will be eligible to participate in the **MIP BSNA Northeast (NANE)** Incentive Plan, subject to the terms and conditions of such plan. Your incentive target will be **10%** of your base annual salary. If transitioned from October 1 through July 1, your bonus participation will begin on the first day of the month following your new assignment (unless the date of change is the first business day of the month) and your bonus will be prorated for this fiscal year 2023. If transitioned AFTER July 1, your bonus participation will begin the next fiscal year beginning October 1. These awards are generally paid to participants in December of each year for the previous fiscal year. Plan details will be made available to you upon entering your new role.

<u>Auto Policy</u>
You are being offered a position which is eligible to use a non-decal Company vehicle. Your eligibility to participate in the non-decal Fleet Program is conditional upon you demonstrating that your driving record over the past thirty six (36) months satisfies the Company requirements. Please note that certain types of serious motor vehicle infractions will disqualify you for employment with the Company in a ""driving position"". Consequently, you are hereby required to authorize the Company to obtain your driver's history information to determine your eligibility to operate a motor vehicle while on Company business.

If you meet the Company requirements and are hired, you will be required to maintain a valid driver's license as a condition of your ongoing employment. You will also be required to periodically provide updates to your driver's history to allow the Company to confirm your ongoing eligibility to operate a motor vehicle while on Company business. In the event that the Company provides you with a non-decal Company vehicle, you agree that the Company



may deduct from your salary the applicable monthly personal usage fee in an amount to be determined by the Company. In states where payroll deduction is not permitted, you agree to submit your personal credit card to a 3rd party to allow for Personal Usage Charges (PUC) to be deducted.

Johnson Controls determines which sales and management job positions are eligible for company vehicles based on business need and specific job requirements. In order to qualify to operate a company vehicle, all drivers must have a job title which is on the approved Eligible Job Title list and job responsibilities must be customer facing. In addition, job responsibilities must also require the employee to drive more than 12,000 business miles/18,000 kilometers annually. If an employee does not meet minimum annual business mile/kilometer requirements, Johnson Controls reserves the right to remove the company vehicle and employees can expense business miles/kilometers through expense reporting systems, not to exceed 12,000 business miles/18,000 business kilometers annually. Please note, minimum mileage requirements may be modified at any time, with or without notice, at the sole discretion of the company.

Benefits
You will continue to be eligible for all employee benefits that the company customarily makes available to employees in positions comparable to yours. You will be eligible for vacation in accordance with the Company vacation policy.

Vacation
You will be eligible for vacation in accordance with the Company vacation policy. You will be provided with details by your manager during new hire orientation.

Non-Solicitation
Employee agrees that for the one (1) year period following the Date of Termination, or such longer period of non-solicitation as is included in any offer letter, equity agreement or any other agreement between Employee and the Company or its parent, subsidiaries or affiliates, Employee will not directly or indirectly on behalf of Employee or on behalf of another (i) solicit, recruit, aid or induce employees of the Company (a) with whom Employee has had material contact within the course of Employee's employment during the twelve (12) month period preceding Employee's Date of Termination and had access to Confidential Information, trade secrets or customer relationships; or (b) who were directly managed by or reported to Employee as of the Employee's Date of Termination to leave their employment with the Company in order to accept employment with or render services to or with another person or entity unaffiliated with the Company, or hire or knowingly take any action to assist or aid any other person or entity in identifying or hiring any such employee, or (ii) solicit, aid, or induce any customer of the Company with whom Employee had material contact during the twenty-four (24) month period immediately preceding Employee's Date of Termination to purchase goods or services then sold by the Company from another person or entity, or assist or aid any other persons or entity in identifying or soliciting any such customer, or (iii) otherwise interfere with the relationship of the Company with any of its employees, customers, vendors, agents, or representatives.

Irreparable injury will result to the Company, its business, and its parent, subsidiaries or affiliates in the event of a breach by you of any of your covenants and commitments you have accepted as a condition of this employment offer, including the covenants of non-solicitation. Therefore, in the event of a breach of such covenants and



commitments, the Company reserves all rights to seek any and all remedies and damages permitted under law, including, but not limited to, injunctive relief, equitable relief and compensatory damages.

The non-solicitation provisions are expressly intended to benefit the Company (which includes its parents, subsidiaries and/or affiliates as third party beneficiaries) and its successors and assigns; and the parties expressly authorize the Company (including all third party beneficiaries) and its successors and assigns to enforce these provisions.


<u>Conditions of Employment</u>

Please be advised that notwithstanding anything in this offer letter to the contrary, neither this letter nor any statement made by the Company or its parent, subsidiaries or affiliates is intended to be a contract of employment for a definite period of time. That means that the employment relationship established by this letter is "at will" and either you or the Company may terminate the employment relationship at any time and for any reason, with or without cause or notice. Further, the Company may from time to time, and in its sole discretion, change the terms and conditions of your employment and benefits, with or without notice, and all payments are subject to applicable taxes and other deductions required or permitted by law.

This offer of a new position is conditioned upon your execution of this letter.

**Heather**, I am excited about this new opportunity for you, where we can continue to create a world that's safe, comfortable and sustainable. Should you have any questions with regard to any of the items indicated above, please email **Yuliya Samoylenko** at **yuliya.samoylenko@jci.com**, who will be happy to assist you.

Sincerely,

**Michelle St. Hilaire**
Johnson Controls

# EXHIBIT 2

Mandatory fields are marked with a red indicator.
**Offer**



July 12, 2018

Michelle St. Hilaire
148 St. Hilaire Lane
Williston, Vermont 05495

Dear Michelle:

We are delighted to offer you the position of Fire Service Manager for Johnson Controls Fire Protection LP, a subsidiary or affiliate of Johnson Controls (the "Company"), reporting directly to Gary L Gokey. This position will be located in Clifton Park, NY.

<u>Start Date</u>
Upon acceptance of this new position, your start date has been tentatively scheduled for July 16, 2018. This transition date is subject to change based upon the needs of your new Manager and departing Manager.

<u>Base Salary:</u>
You will receive an annual base salary of $136,059.12. Your salary will be paid according to the normal and customary payroll process of the Company.

<u>Bonus Plan</u>
You will be eligible to participate in our plan named Local Market Ops Incentive Plan FIRE, subject to the terms and conditions of such plan. Your incentive target will be 15% of your base annual salary. If hired from October 1 through July 1, your bonus participation will begin on the first day of the month following your date of hire (unless the date of hire is the first business day of the month) and your bonus will be prorated for this fiscal year. If hired AFTER July 1, your bonus participation will begin the next fiscal year beginning October 1. These awards are generally paid to participants in December of each year for the previous fiscal year. Plan details will be made available to you upon your commencement of employment.

<u>Auto Policy</u>
You are being offered a position which is eligible to use a non-decal Company vehicle. Your eligibility to participate in the non-decal Fleet Program is conditional upon you demonstrating that your driving record over the past thirty six (36) months satisfies the Company requirements. Please note that certain types of serious motor vehicle infractions will disqualify you for employment with the Company in a "driving position". Consequently, you are hereby required to authorize the Company to obtain your driver's history information to determine your eligibility to operate a motor vehicle while on Company business.

If you meet the Company requirements and are hired, you will be required to maintain a valid driver's license as a condition of your ongoing employment. You will also be required to periodically provide updates to your driver's history to allow the Company to confirm your ongoing eligibility to operate a motor vehicle while on Company business.

In the event that the Company provides you with a non-decal Company vehicle, you agree that the Company may deduct from your salary the applicable monthly personal usage fee in an amount to be determined by the Company. In states where payroll deduction is not permitted, you agree to submit your personal credit card to a 3rd party to allow for Personal Usage Charges (PUC) to be deducted.

<u>Benefits</u>
You will continue to be eligible for all employee benefits that the company customarily makes available to employees in positions comparable to yours. You will be eligible for vacation in accordance with the Company vacation policy.

<u>Non-Solicitation</u>
In accepting this employment offer, and in consideration of this employment offer, your continued employment, and/or

the Company's obligation and promise to provide you with confidential and propriety information pertaining to its business operations and/or customers, and your promise and obligation not to use or disclose that information except in the course of performing your job duties, you agree that, except as prohibited by law, during your employment with the Company or its parent, subsidiaries or affiliates, and for the two (2) year period thereafter, you will not, directly or indirectly, on your own behalf or on behalf of another (i) solicit, recruit, aid or induce any employees of the Company or its parent, subsidiaries or affiliates to leave their employment with the Company or its parent, subsidiaries or affiliates in order to accept employment with or render services to another person or entity unaffiliated with the Company or its parent, subsidiaries or affiliates, or hire or knowingly take any action to assist or aid any other person or entity in identifying or hiring any such employee, or (ii) solicit, aid, or induce any customer of the Company or its parent, subsidiaries or affiliates to purchase goods or services then sold by the Company or its parent, subsidiaries or affiliates from another person or entity, or assist or aid any other persons or entity in identifying or soliciting any such customer, or (iii) otherwise interfere with the relationship of the Company or its parent, subsidiaries or affiliates with any of its employees, customers, vendors, agents, or representatives.

Irreparable injury will result to the Company, its business, and its parent, subsidiaries or affiliates in the event of a breach by you of any of your covenants and commitments you have accepted as a condition of this employment offer, including the covenants of non-solicitation. Therefore, in the event of a breach of such covenants and commitments, the Company reserves all rights to seek any and all remedies and damages permitted under law, including, but not limited to, injunctive relief, equitable relief and compensatory damages.

The non-solicitation provisions are expressly intended to benefit the Company (which includes its parents, subsidiaries and/or affiliates as third party beneficiaries) and its successors and assigns; and the parties expressly authorize the Company (including all third party beneficiaries) and its successors and assigns to enforce these provisions.

### Conditions of Employment

Please be advised that notwithstanding anything in this offer letter to the contrary, neither this letter nor any statement made by the Company or its parent, subsidiaries or affiliates is intended to be a contract of employment for a definite period of time. That means that the employment relationship established by this letter is "at will" and either you or the Company may terminate the employment relationship at any time and for any reason, with or without cause or notice. Further, the Company may from time to time, and in its sole discretion, change the terms and conditions of your employment and benefits, with or without notice, and all payments are subject to applicable taxes and other deductions required or permitted by law.

This offer of a new position is conditioned upon your execution of this letter.

Michelle, I am excited about this new opportunity for you, where we can continue to create a world that's safe, comfortable and sustainable. Should you have any questions with regard to any of the items indicated above, please email Yuliya Samoylenko at yuliya.samoylenko-ext@jci.com , who will be happy to assist you.

Sincerely,
Gary L Gokey
Johnson Controls


Offer Letter Attachments
—


＊Provide your offer response
Accept the offer


＊Provide your e-signature by entering your Last Name in the space below.
******


Signed by

Michelle St. Hilaire


Signed on
7/12/18


Captured from IP Address
216.3.51.95

# EXHIBIT 3

For and in consideration of employment or the continuation of employment on an at-will basis by Johnson Controls, and affiliated companies and joint ventures ("Employer") or for other consideration, the receipt and adequacy of which is acknowledged, Employee hereby agrees as follows:

**1. At-will Employment.  Nothing in this Agreement alters the at-will nature of Employee's employment with the Company. Employee acknowledges that either Employee or the Company may terminate the employment relationship at any time, for any reason, with or without cause.**  Only an officer of the Company has the authority to enter into any agreement for employment for a specified period of time.  No agreement limiting the at-will nature of Employee's employment with the Company is enforceable unless it is in writing and signed by an officer of the Company.

**2. Background.**  Employer has developed and continues to develop specialized techniques, processes, practices and products which provide it with a competitive advantage.  Employer has expended significant time, money and resources in its business activities, including in research and development activities.  Employer has developed, owns or has otherwise obtained exclusive rights relating to various aspects of its business, including the design, manufacture, application, sale, and testing of products and related technology.  Employee agrees to perform work on behalf of Employer, including but not limited to providing services, designs, prototypes and materials as directed by Employer, and other related work and services (collectively, the "Work") according to the terms and conditions set forth in this Agreement.  This Agreement shall cover all Work Employee performs after Employee commences employment with Employer.

**3. Intellectual Property.**  Employee shall promptly disclose to Employer any and all inventions, whether patentable or unpatentable, and any works of authorship including but not limited to computer programs (individually or collectively referred to as "Intellectual Property") which are made or conceived by Employee, either solely or jointly, during the term of Employee's employment and relating to the current and reasonably anticipated business of Employer.  "Intellectual Property" also includes any idea, concept, design, prototype, product configuration, invention, improvement, modification, patentable subject matter, method, process, technique, procedure, system, plan, model, program, software or code, data, specification, drawing, diagram, flow chart, documentation, know-how, work of authorship, copyrightable subject matter, derivative work, trademark or trade name, and any protection under any law providing or creating intellectual property rights, including the Uniform Trade Secrets Act.  Intellectual Property also includes Confidential and Proprietary Information (defined below) learned, obtained or developed in connection with my employment.  If I am employed in California, I understand that I am not required to assign, or to offer to assign, any rights in an invention developed entirely on my own time without using Employer's equipment, supplies, facilities, or trade secret information expect for those inventions that either: a) relate at the time of conception or reduction to practice of the invention to Employer's business, or actual or demonstrably anticipated research or development of Employer; or b) results from any work performed by Employee for Employer.

**4. Assignment and Ownership.**  Employee acknowledges and agrees that Intellectual Property under this Agreement is Employer's sole and exclusive property.  Employee agrees to assign and hereby assigns to Employer ownership of all right, title and interest in Intellectual Property relating to the Work, including any Intellectual Property (of any kind) conceived, created or otherwise obtained by Employee during the term of this Agreement.  Employee will neither obtain nor retain any right in Intellectual Property under this Agreement.  Any copyrightable work under this Agreement will be considered to be a "work made for hire" on Employer's behalf under the Copyright Act, as amended, 17 U.S.C. § 101 et seq. Employer owns all physical property, materials and prototypes related to the Work.  Employee agrees to cooperate with Employer and to assist in the preparation and execution of all documents relating to any effort by or on behalf of Employer to apply for, obtain, maintain, transfer, or enforce any intellectual property right relating to this Agreement, including any patent, trademark, trade secret or copyright, at Employer's request and expense.  Without further compensation, Employee will do all lawful things, including maintaining adequate and current records which shall be the property of Employer, rendering assistance executing documents and performing all acts reasonably necessary for Employer to perfect, at its sole option and expense, its right in Intellectual Property in the United States or any other country or jurisdiction.

**5. <u>Confidential Information.</u>**  Employee agrees during the course of Employee's employment, Employer may disclose, or promise to provide Employee with confidential, proprietary and competitively sensitive information from time to time concerning, among other things, Employer's strategies, objectives, performance and business prospects ("Confidential Information" as described below).  Employee agrees that during his or her employment with Employer, and until such time thereafter as the Confidential Information is no longer confidential through no fault of the Employee, Employee shall not use or disclose any Confidential Information except for the benefit of Employer in the course of the Employee's employment, and shall not use or disclose any Confidential Information in competition with or to the detriment of Employer, or for the benefit of Employee or anyone else other than Employer.  "Confidential Information" means any information that is not generally known outside the Employer, relating to any phase of business of Employer, whether existing or foreseeable, including information conceived, discovered or developed by Employee. Confidential Information includes, but is not limited to: project files, product designs, drawings, sketches and processes; production characteristics; testing procedures and results thereof; manufacturing methods, processes, techniques and test results; plant layouts, tooling, engineering evaluations and reports; business plans, financial statements and projections; operating forms (including contracts) and procedures; payroll and personnel records; non-public marketing materials, plans and proposals; customer lists and information, and target lists for new clients and information relating to potential clients; software codes and computer programs; training manuals; policy and procedure manuals; raw materials sources, price and cost information; administrative techniques and documents; and any information received by the Company under an obligation of confidentiality to a third party.  It does not include any information Employee can prove was in his or her possession prior to Employee's employment, or that separately has become public through no fault of Employee, or that is merely general knowledge or skill acquired through training and experience. Employee recognizes and acknowledges that Employer's success depends upon, among other things, current and former employees keeping such Confidential Information confidential.  This clause is not intended to limit or diminish Employee's independent, indefinite duty not to misappropriate, disclose or use Employer's trade secrets. Employee agrees to respond to reasonable questions from Employer regarding Employee's employment with any subsequent employer that could potentially conflict with Employee's obligations of confidentiality or implicate disclosure of Confidential Information.

Notwithstanding the foregoing, nothing herein shall prohibit Employee from reporting or otherwise disclosing possible violations of state, local or federal law or regulation to any governmental agency or entity, or making other disclosures that, in each case, are protected under whistleblower provisions of local, state or federal law or regulation. Nothing in this Agreement is intended to discourage or restrict Employee from reporting any theft of trade secrets pursuant to the Defend Trade Secrets Act of 2016 ("DTSA") or other applicable state or federal law.  The DTSA provides: An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to any attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation or law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to an attorney for the individual and use the trade secret information in the court proceeding, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

**6. <u>Return of Confidential Information.</u>**  Upon termination of Employee's employment with Employer, whether voluntary or otherwise, or at any time upon Employer's request, Employee shall promptly deliver and return to Company all of Employer's property and Confidential Information including, but not limited to, computers, tablets, cellular telephones, drawings, blueprints, manuals, samples, customer lists, financial data, letters, notes, notebooks, reports and all copies thereof, and any and all other materials of a secret or confidential nature relating to Employer's business which are in the possession or under the control of Employee.

**7. <u>Remedies and Injunctive Relief.</u>**  Employee acknowledges that the restrictions contained in this Agreement are necessary to protect Employer's legitimate interests and that any violation of this

Agreement would result in irreparable harm and injury to Employer.  Employee further acknowledges that a remedy at law for any breach or threatened breach of the provisions of this Agreement would be inadequate and, therefore, agrees Employer shall be entitled to injunctive relief and any other legal or equitable remedies available Employer in the case of any such breach or threatened breach. In the event that a court determines Employee has breached or threatened to breach this agreement, Employee agrees to reimburse Employer for all of its attorneys' fees and costs incurred in enforcing the terms of this Agreement.  However, nothing in this Agreement shall be construed as prohibiting Employer from pursuing any other remedies available for such breach or threatened breach against Employee or Employee's new employer, which may also include, but not be limited to, contract damages, lost profits and punitive damages.

**8. <u>Successors and Assigns.</u>**  This Agreement shall be binding upon, and inure to the benefit of, the parties and their respective successors and permitted assigns.  Employee may not assign Employee's rights and obligations under this Agreement.  Employer may assign this Agreement and/or its rights or obligations under this Agreement.  Any and all rights and remedies under this Agreement shall inure to the benefit of and be enforceable by any successor or assignee of Employer.  The terms of this Agreement cannot be waived or modified except expressly in writing, signed by an officer of Employer.

**9. <u>Severability.</u>**  If one or more provisions of this Agreement is held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained therein.

**10.** Waiver of Breach.  The waiver by either party of the breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by either party.

**11. <u>Governing Law, Venue and Consent to Jurisdiction.</u>**  This Agreement shall be governed by and construed in accordance with the laws and judicial decisions of the State of Wisconsin without regard to conflicts of law principles. Recipient hereby consents to the exclusive jurisdiction and venue in the federal and state courts of the State of Wisconsin, Milwaukee County, for the resolution of all disputes arising under, or relating to, this Agreement.

**12. <u>Effectiveness of Agreement.</u>** This Agreement becomes effective when Employee signs it, the obligations under it continue throughout the entire period of time Employee is employed by Employer, without regard to the business within the Company with which Employee is associated and these obligations will continue after, and survive, the end of Employee's employment with the Employer.

I have listed at the bottom of this page all Inventions and Improvements, patented or otherwise, that I made or conceived prior to employment with Employer, and desire that these inventions and improvements be excluded from this Agreement.

| Document | Effective Date | Document Attachment | Signature Type | Signed By | Signature Date | Signature Statement |
|---|---|---|---|---|---|---|
| US - Employee Intellectual Property and Confidentiality Agreement | 08/19/2021 | Employee Confidentiality and IP Agreement.docx | e-signature | Heather Clark (Terminated) | 03/31/2023 04:13:37 PM | By checking this box, I confirm I have read and accept to the terms and conditions of the foregoing document. This agreement is legally binding.<br><br>IMPORTANT: if you do not wish to agree to the foregoing document or if you have any questions before accepting. DO NOT check this box and please contact your recruiter. |

For and in consideration of employment or the continuation of employment on an at-will basis by Johnson Controls, and affiliated companies and joint ventures ("Employer") or for other consideration, the receipt and adequacy of which is acknowledged, Employee hereby agrees as follows:

**1. At-will Employment.  Nothing in this Agreement alters the at-will nature of Employee's employment with the Company. Employee acknowledges that either Employee or the Company may terminate the employment relationship at any time, for any reason, with or without cause.**  Only an officer of the Company has the authority to enter into any agreement for employment for a specified period of time.  No agreement limiting the at-will nature of Employee's employment with the Company is enforceable unless it is in writing and signed by an officer of the Company.

**2. Background.**  Employer has developed and continues to develop specialized techniques, processes, practices and products which provide it with a competitive advantage.  Employer has expended significant time, money and resources in its business activities, including in research and development activities.  Employer has developed, owns or has otherwise obtained exclusive rights relating to various aspects of its business, including the design, manufacture, application, sale, and testing of products and related technology.  Employee agrees to perform work on behalf of Employer, including but not limited to providing services, designs, prototypes and materials as directed by Employer, and other related work and services (collectively, the "Work") according to the terms and conditions set forth in this Agreement.  This Agreement shall cover all Work Employee performs after Employee commences employment with Employer.

**3. Intellectual Property.**  Employee shall promptly disclose to Employer any and all inventions, whether patentable or unpatentable, and any works of authorship including but not limited to computer programs (individually or collectively referred to as "Intellectual Property") which are made or conceived by Employee, either solely or jointly, during the term of Employee's employment and relating to the current and reasonably anticipated business of Employer.  "Intellectual Property" also includes any idea, concept, design, prototype, product configuration, invention, improvement, modification, patentable subject matter, method, process, technique, procedure, system, plan, model, program, software or code, data, specification, drawing, diagram, flow chart, documentation, know-how, work of authorship, copyrightable subject matter, derivative work, trademark or trade name, and any protection under any law providing or creating intellectual property rights, including the Uniform Trade Secrets Act.  Intellectual Property also includes Confidential and Proprietary Information (defined below) learned, obtained or developed in connection with my employment.  If I am employed in California, I understand that I am not required to assign, or to offer to assign, any rights in an invention developed entirely on my own time without using Employer's equipment, supplies, facilities, or trade secret information expect for those inventions that either: a) relate at the time of conception or reduction to practice of the invention to Employer's business, or actual or demonstrably anticipated research or development of Employer; or b) results from any work performed by Employee for Employer.

**4. Assignment and Ownership.**  Employee acknowledges and agrees that Intellectual Property under this Agreement is Employer's sole and exclusive property.  Employee agrees to assign and hereby assigns to Employer ownership of all right, title and interest in Intellectual Property relating to the Work, including any Intellectual Property (of any kind) conceived, created or otherwise obtained by Employee during the term of this Agreement.  Employee will neither obtain nor retain any right in Intellectual Property under this Agreement.  Any copyrightable work under this Agreement will be considered to be a "work made for hire" on Employer's behalf under the Copyright Act, as amended, 17 U.S.C. § 101 et seq.  Employer owns all physical property, materials and prototypes related to the Work.  Employee agrees to cooperate with Employer and to assist in the preparation and execution of all documents relating to any effort by or on behalf of Employer to apply for, obtain, maintain, transfer, or enforce any intellectual property right relating to this Agreement, including any patent, trademark, trade secret or copyright, at Employer's request and expense.  Without further compensation, Employee will do all lawful things, including maintaining adequate and current records which shall be the property of Employer, rendering assistance executing documents and performing all acts reasonably necessary for Employer to perfect, at its sole option and expense, its right in Intellectual Property in the United States or any other country or jurisdiction.

5. **Confidential Information.**  Employee agrees during the course of Employee's employment, Employer may disclose, or promise to provide Employee with confidential, proprietary and competitively sensitive information from time to time concerning, among other things, Employer's strategies, objectives, performance and business prospects ("Confidential Information" as described below).  Employee agrees that during his or her employment with Employer, and until such time thereafter as the Confidential Information is no longer confidential through no fault of the Employee, Employee shall not use or disclose any Confidential Information except for the benefit of Employer in the course of the Employee's employment, and shall not use or disclose any Confidential Information in competition with or to the detriment of Employer, or for the benefit of Employee or anyone else other than Employer.  "Confidential Information" means any information that is not generally known outside the Employer, relating to any phase of business of Employer, whether existing or foreseeable, including information conceived, discovered or developed by Employee. Confidential Information includes, but is not limited to: project files, product designs, drawings, sketches and processes; production characteristics; testing procedures and results thereof; manufacturing methods, processes, techniques and test results; plant layouts, tooling, engineering evaluations and reports; business plans, financial statements and projections; operating forms (including contracts) and procedures; payroll and personnel records; non-public marketing materials, plans and proposals; customer lists and information, and target lists for new clients and information relating to potential clients; software codes and computer programs; training manuals; policy and procedure manuals; raw materials sources, price and cost information; administrative techniques and documents; and any information received by the Company under an obligation of confidentiality to a third party.  It does not include any information Employee can prove was in his or her possession prior to Employee's employment, or that separately has become public through no fault of Employee, or that is merely general knowledge or skill acquired through training and experience. Employee recognizes and acknowledges that Employer's success depends upon, among other things, current and former employees keeping such Confidential Information confidential.  This clause is not intended to limit or diminish Employee's independent, indefinite duty not to misappropriate, disclose or use Employer's trade secrets. Employee agrees to respond to reasonable questions from Employer regarding Employee's employment with any subsequent employer that could potentially conflict with Employee's obligations of confidentiality or implicate disclosure of Confidential Information.

Notwithstanding the foregoing, nothing herein shall prohibit Employee from reporting or otherwise disclosing possible violations of state, local or federal law or regulation to any governmental agency or entity, or making other disclosures that, in each case, are protected under whistleblower provisions of local, state or federal law or regulation. Nothing in this Agreement is intended to discourage or restrict Employee from reporting any theft of trade secrets pursuant to the Defend Trade Secrets Act of 2016 ("DTSA") or other applicable state or federal law.  The DTSA provides: An individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state or local government official, either directly or indirectly, or to any attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation or law; or (b) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to an attorney for the individual and use the trade secret information in the court proceeding, if the individual (a) files any document containing the trade secret under seal; and (b) does not disclose the trade secret, except pursuant to court order.

6. **Return of Confidential Information.**  Upon termination of Employee's employment with Employer, whether voluntary or otherwise, or at any time upon Employer's request, Employee shall promptly deliver and return to Company all of Employer's property and Confidential Information including, but not limited to, computers, tablets, cellular telephones, drawings, blueprints, manuals, samples, customer lists, financial data, letters, notes, notebooks, reports and all copies thereof, and any and all other materials of a secret or confidential nature relating to Employer's business which are in the possession or under the control of Employee.

7. **Remedies and Injunctive Relief.**  Employee acknowledges that the restrictions contained in this Agreement are necessary to protect Employer's legitimate interests and that any violation of this

Agreement would result in irreparable harm and injury to Employer.  Employee further acknowledges that a remedy at law for any breach or threatened breach of the provisions of this Agreement would be inadequate and, therefore, agrees Employer shall be entitled to injunctive relief and any other legal or equitable remedies available Employer in the case of any such breach or threatened breach. In the event that a court determines Employee has breached or threatened to breach this agreement, Employee agrees to reimburse Employer for all of its attorneys' fees and costs incurred in enforcing the terms of this Agreement.  However, nothing in this Agreement shall be construed as prohibiting Employer from pursuing any other remedies available for such breach or threatened breach against Employee or Employee's new employer, which may also include, but not be limited to, contract damages, lost profits and punitive damages.

**8. Successors and Assigns.**  This Agreement shall be binding upon, and inure to the benefit of, the parties and their respective successors and permitted assigns.  Employee may not assign Employee's rights and obligations under this Agreement.  Employer may assign this Agreement and/or its rights or obligations under this Agreement.  Any and all rights and remedies under this Agreement shall inure to the benefit of and be enforceable by any successor or assignee of Employer.  The terms of this Agreement cannot be waived or modified except expressly in writing, signed by an officer of Employer.

**9. Severability.**  If one or more provisions of this Agreement is held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had not been contained therein.

**10.** Waiver of Breach.  The waiver by either party of the breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by either party.

**11. Governing Law, Venue and Consent to Jurisdiction.**  This Agreement shall be governed by and construed in accordance with the laws and judicial decisions of the State of Wisconsin without regard to conflicts of law principles. Recipient hereby consents to the exclusive jurisdiction and venue in the federal and state courts of the State of Wisconsin, Milwaukee County, for the resolution of all disputes arising under, or relating to, this Agreement.

**12. Effectiveness of Agreement.** This Agreement becomes effective when Employee signs it, the obligations under it continue throughout the entire period of time Employee is employed by Employer, without regard to the business within the Company with which Employee is associated and these obligations will continue after, and survive, the end of Employee's employment with the Employer.

I have listed at the bottom of this page all Inventions and Improvements, patented or otherwise, that I made or conceived prior to employment with Employer, and desire that these inventions and improvements be excluded from this Agreement.